IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 06-0205** |
| | ) | **Electronically Filed** |
| **ANTHONY LEE BURKS** | ) | |

### MEMORANDUM OPINION

**January 11, 2007**

Before the Court is defendant's Motion to Suppress Evidence (doc. no. 24). The Court conducted a hearing on said motion on November 9, 2006. After due consideration, the Court will now deny the motion.

**Findings of Fact**.

There is no significant dispute of historical facts, although the parties disagree about the inferences that arise therefrom and their legal consequences. After careful review of all of the testimony and exhibits presented at the suppression hearing, see Transcript (doc. no. 36), and the parties' proposed findings of fact and conclusions of law, the Court makes the following credibility determination, findings of fact and conclusions.

**Credibility Determination.**

City of Pittsburgh Police Officers David Honick and Paul Roetter testified consistently at the suppression hearing on behalf of the government; defendant did not testify. Although defendant demonstrated that some of the circumstances of his arrest as recounted at the suppression hearing did not make it into Officer Roetter's police report of the incident, said omissions were adequately explained by the officers and/or are immaterial to the issues presented

in defendant's motion to suppress.  Accordingly, the Court deems the testimony of Officers Honick and Roetter to be credible, and accepts said testimony as rendered.  Based on that testimony, the Court finds as follows.

**Historical Findings.**

1.      On December 27, 2005, around 10:00 p.m., City of Pittsburgh Police Officers David Honick and Paul Roetter were patrolling Pittsburgh's North Side in their police cruiser as part of the Street Response Unit when they stopped a silver Misubishi Diamante sedan because the factory installed, rear center brake light in the rear window was inoperable.

2.      In the car were the driver, Andre Frank, defendant Anthony Burks in the front passenger seat, and Eric Clancy, the right rear passenger.  The officers called for back-up, and other members of the Street Response Unit quickly arrived on the scene.

3.      As Officer Roetter approached the car, he noticed the right rear passenger remove something from his waistband and drop it to the floor, and advised Officer Honick of his observation.  Officer Honick directed all of the occupants of the car to place their hands where the officers could see them, and they complied.

4.      Officer Honick approached the driver's side, requested license and registration from Frank, and requested his consent to search the car.  Frank consented, and read and signed a written consent form (a Pittsburgh Police Form 5).

5.      Officer Roetter directed Clancy to step out, observed a firearm on the floorboards, and retrieved the black semi-automatic weapon from the car.  When Clancy did not produce a permit on Roetter's request, Clancy was arrested.  Officer Roetter did not include in his police incident report that he had questioned Clancy about a permit or that Clancy did not have one.

6. Officer Honick then approached the front passenger, defendant, and asked him for identification. Defendant was unresponsive and Honick told him to step out of the car.

7. When defendant stepped out, Officer Honick saw that his right coat pocket was weighed down to one side as if carrying a heavy object, and then he observed the outline of a firearm in the coat pocket, reached in and retrieved a Taurus Model PT-99, 9mm pistol. The firearm was loaded, cocked, and had a round in the chamber.

8. Officer Honick asked defendant if he had a permit to carry the firearm, and defendant remained unresponsive. Transcript at 14-15, 26, 28, 39. Thereupon, Honick arrested defendant for carrying a firearm without a license, as "John Doe."

9. The police report reflects that both Clancy and defendant were arrested and charged with carrying firearms without a license in violation of 18 Pa.C.S. § 6122(a) ("When carrying a firearm concealed on or about one's person or in a vehicle, an individual licensed to carry a firearm shall, upon lawful demand of a law enforcement officer, produce the license for inspection.").

10. Officer Roetter did not include in his police incident report that Honick had questioned defendant about a permit and that defendant did not answer, nor did he hear Officer Honick questioning defendant about the permit. Neither Honick nor Roetter had any specific explanation why their questioning of the men about permits to carry firearms did not make it into the police report, but the officers noted that the charges of carrying firearms without a license in violation of 18 Pa.C.S. § 6122(a) implied that the men had refused their requests to show permits.

11. Following the arrests, the officers warned the driver about the Mitsubishi's non-

functioning rear center brake light, but did not issue a citation.

12.     Officer Honick's training led him to understand that title 67 of the Motor Vehicle Equipment Code requires all *factory installed* lighting equipment to be in operating condition, including the rear center brake lights. Transcript, at 15, 22-24. Officer Honick would not pull an older car over for not having an operational center rear brake light if it did not come with one factory installed; he would only pull over those cars that had factory installed, center rear brake lights that were not functioning.

13.     Officer Honick was not certain, but "off the top of his head" he believed the section of the Code requiring brake lights to be in working order was section 4303(b) of the Motor Vehicle Code, 75 Pa.C.S. § 4303(b). Transcript at 20.

14.     Officer Roetter's testimony was similar, i.e., he believed that all brake lights had to be operational, including rear window mounted center lights, and that it was a violation of section 4303(b) of the Pennsylvania Motor Vehicle Code to operate a vehicle with any inoperable brake lights. Transcript at 56, 83-85, 88, 61-65.

**Legal Framework**.

Generally, police officers are expected to stop vehicles -- and are justified in stopping vehicles -- on reasonable suspicion that the driver or the vehicle are in violation of traffic laws. See, e.g., *United States v. Toney*, 124 Fed.Appx. 713, 715 (3d Cir. 2005) ("Toney was operating a vehicle with an invalid license plate. Because of this traffic violation, Office Devine was justified in making the initial stop."), citing: *Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" ); *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)

(holding that traffic stops are justified under the Fourth Amendment where the officer has a reasonable suspicion that either the motorist or the vehicle are in violation of the law); *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ( "It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."); *United States v. Kikumura*, 918 F.2d 1084, 1092 (3d Cir. 1990) (traffic stop reasonable where officer observed defendant violating traffic code); and 75 Pa.C.S. § 6308(b) (authorizing police officers to conduct a traffic stop where there is a reasonable suspicion of a traffic code violation). The United States Court of Appeals for the Third Circuit recently canvassed the traffic stop law, and stated:

> When one peruses the traffic-stop suppression caselaw, one is struck by how rarely a traffic stop is found to have been illegal. In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime. And once a car has been legally stopped, the police may "escalate" the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."). Courts give considerable deference to police officers' determinations of reasonable suspicion, *see, e.g., United States v. Nelson* 284 F.3d 472, 482 (3d Cir. 2002), and the cases are steadily increasing the constitutional latitude of the police to pull over vehicles.

*United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (Fisher, J.; parallel citations omitted) (when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against any occupant of the vehicle; guns found in vehicle after illegal stop had to be suppressed in prosecution against vehicle's occupant).

Judge Seitz set forth the standards for gauging the reasonableness of a traffic stop for

suspected motor vehicle code violations in *United States v. Johnson*, 63 F.3d 242 (3d Cir. 1995):

> The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment. *See United States v. Hensley*, 469 U.S. 221, 226 (1985) . . . . However, a stop to check a driver's license and registration is constitutional when it is based on an "articulable and reasonable suspicion that . . . either the vehicle or an occupant" has violated the law. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) . . . ; see also 75 Pa.Cons.Stat.Ann. § 6308(b) (Supp. 1995). FN2
>
>> FN2. Under section 6308(b) of the Pennsylvania Vehicle Code, a trooper who has reasonable and articulable grounds to believe that a vehicle or driver is in violation of the Vehicle Code may stop the vehicle. . . . Although an actual violation need not be established, a reasonable basis for the officer's belief is required to validate the stop . . . .
>
> As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. . . . However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable. . . .
>
> [T]o justify the traffic stop under *Prouse*, [the officer is required to demonstrate] an articulable and reasonable suspicion that the car was in violation of Pennsylvania law. *See, e.g., Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332 (1977) . . . .

*Johnson*, 63 F.3d at 246 (parallel and other citations omitted).

More recently, the Court of Appeals for the Third Circuit reinforced the principle that a police officer need only articulate reasonable suspicion, not probable cause, that the driver or the car is violating motor vehicle laws in order to justify a traffic stop. *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3d Cir. 2006). Certain dictum in *Whren* had been read by some courts to support a probable cause standard for motor vehicle code violation traffic stops, but in *Delfin-Colina*, our Court of Appeals agreed with the majority of the Courts of Appeals concluding that this dictum was not intended to "switch gears," construing *Whren* to continue to

"require only that the police have 'reasonable suspicion' to believe that a traffic law has been broken." *Id.* at 396 (collecting cases). Thus, the Court of Appeals for the Third Circuit stated: "*Whren* was not conceived as altering the longstanding reasonable suspicion standard recognized in the traffic-stop setting. Thus, we now join our sister circuits in holding that the *Terry* reasonable suspicion standard applies to routine traffic stops." *Id.* at 397.

Additionally, *Delfin-Colina* considered the effect of an officer's mistake of fact or mistake of law with regard to the validity of the traffic stop, stating as follows:

> Though reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the "specific, articulable facts" to justify a reasonable suspicion to believe that an individual has violated the traffic laws. . . . And a reviewing court must consider whether the "rational interferences from those facts reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Ultimately, our mandate is to weigh "the totality of the circumstances - the whole picture." . . .
>
> The *Whren* Court explained that a court should undertake an objective review of the officer's rationale for the investigatory traffic stop. 517 U.S. at 806. That is, a court should only look to whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction. . . . The Court explained that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id.* at 813 . . . .
>
> Taken together, then, *Terry* and *Whren* stand for the proposition that a traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact "does not violate the Fourth Amendment." . . . [*United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)]; *see also Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) (noting that factual determinations made by government agents need not "always be correct," but they always have to be "reasonable") . . . .

> Under this framework, though mistakes of fact are rarely fatal to an officer's reasonable, articulable belief that an individual was violating a traffic ordinance at the time of a stop, many of our sister circuits have held that mistakes of law - even reasonable ones - can render a traffic stop "unreasonable" under the Fourth Amendment.

*Delfin-Colina*, 464 F.3d at 397-98 (parallel and numerous other citations omitted).

At this point, the Court of Appeals for the Third Circuit distinguished the decisions of the "sister circuits" which held that "mistakes of law - even reasonable ones - can render a traffic stop 'unreasonable' under the Fourth Amendment," and held that mistakes of law are not *per se* unreasonable. *Id*. at 399-400. Specifically, the Court of Appeals for the Third Circuit explained:

> In each of the above cases, the specific, articulable facts revealed that the alleged infractions upon which the vehicles were stopped were not based in law. In other words, the objective review of the record required by *Whren* showed that the stopped individuals in each of these cases had not violated any applicable statute or ordinance.
>
> What these cases do not, however, say is that a mistake of law by a police officer renders a traffic stop *per se* unreasonable. Instead, a mistake of law is *only unreasonable when the officer does not offer facts that objectively show that the identified law was actually broken.* In situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision. Therefore an officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support *an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction.* As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

*Delfin-Colina* at 399-400.

In *Delfin-Colina*, the Pennsylvania State Trooper had mistakenly believed that the Pennsylvania Motor Vehicle Code, 75 Pa.C.S. § 101 et seq., prohibits driving a vehicle with *any*

object hanging from the windshield rear view mirror. In fact, the Motor Vehicle Code provides that a motor vehicle may not be driven "with any object or material hung from the inside rearview mirror or otherwise hung, placed or attached *in such a position as to materially obstruct, obscure or impair the driver's vision* through the front windshield or any manner *as to constitute a safety hazard*." 75 Pa.C.S. § 4524(c) (emphasis added). Although the trooper was mistaken as to the law, he actually believed, when he pulled Mr. Delfin-Colina over, that the crucifix hanging from the windshield mirror was a low-hanging item that might either obstruct or otherwise impair the driver's vision because of its potential to swing back and forth. Thus, the Court of Appeals for the Third Circuit held that although the trooper "made a significant mistake of law . . . an objective review of the facts shows that an officer who correctly interpreted §4524(c) and was in Trooper Wagner's position would have possessed reasonable suspicion to believe that Delfin-Colina was in violation of § 4524(c). Because it is this objective analysis that is controlling under *Whren*, Trooper Wagner's mistake of law did not render the traffic stop unconstitutional." *Id*. at 400-01.

**Pertinent Pennsylvania Motor Vehicle and Administrative Code Provisions.**

Local police officers are authorized to enforce the Pennsylvania Motor Vehicle Code and investigate possible violations thereof as follows:

> 6308. Investigation by police officers.
>
> \*   \*   \*
>
> (b) *Authority of police officer*.--*Whenever a police officer* is engaged in a systematic program of checking vehicles or drivers or *has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal*, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or

engine number or the driver's license, or *to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.*

\* \* \*

6311. Enforcement authority.

If a driver fails or refuses to comply with the requirements of a police officer or qualified Commonwealth employee given pursuant to this title, the police officer or Commonwealth employee shall have authority to take the vehicle into temporary custody for the purpose of inspecting, testing or weighing the vehicle, its equipment, documents or load. In addition to any fine or penalty attributable to the weight, inspection, test or other offense, any driver who fails or refuses to comply commits a summary offense and shall, upon conviction, be sentenced to pay a fine of $500. . . .

75 Pa.C.S. §§ 6308, 6311 (emphasis added).

Part IV of the Pennsylvania Motor Vehicle Code proscribes the required and permissible "Vehicle Characteristics." 75 Pa.C.S. §§ 4101 - 4982, in relevant parts as follows:

4101. Purpose of part.

The *purpose* of this chapter and *Chapters 43 (relating to lighting equipment)* and 45 (relating to other required equipment) *is to establish minimum standards for vehicle equipment the performance of which is related to vehicle safety*, noise control and air quality and *to make unlawful the* sale and *use of items which do not comply with the requirements of this part or with the standards and regulations promulgated by the department*.

\* \* \*

4107. Unlawful activities.

(a) Violation of vehicle equipment standards.--

(b) Other violations.-- It is unlawful for any person to do any of the following:

\* \* \*

>    (2) *Operate . . . on any highway in this Commonwealth any vehicle . . . which is not equipped as required under this part or under department regulations or when the driver is in violation of department regulations or the vehicle . . . is otherwise in an unsafe condition or in violation of department regulations.*

75 Pa.C.S. §§ 4101, 4107 (emphasis added).

Chapter 43 of the Motor Vehicle Code, 75 Pa.C.S. §§4301- 4309, regulates "Lighting Equipment," and provides in relevant parts:

>    4301. Promulgation of regulations by department.
>
>    The department shall promulgate regulations governing the number, visibility, color, size, type, construction, location and use of lamps, other lighting equipment and any retroreflective surfaces on vehicles.
>
>    4302. Periods for requiring lighted lamps.
>
>    \*    \*    \*
>
>    (b) Signal lights.--Stop lights, turn signals and other signaling devices shall be lighted as prescribed in this title.
>
>    4303. General lighting requirements.
>
>    \*    \*    \*
>
>    (b) Rear lighting.--Every vehicle operated on a highway shall be equipped with a *rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps and license plate light, in conformance with regulations of the department*. If a vehicle is equipped with a centrally mounted rear stop light, a decal or overlay may be affixed to the centrally mounted rear stop light if the decal or overlay meets all applicable State and Federal regulations.

75 Pa.C.S. §§ 4301-4303.

Finally, Title 67 of the Pennsylvania Administrative Code, Part I, Subpart A, sets forth the Department regulations implementing the Vehicle Code, and provides in relevant part as follows:

>153.1 Purpose and scope.
>
>This chapter specifies *requirements for original and replacement lamps*, reflective devices and other associated equipment *necessary for* signaling and for *the safe operation of motor vehicles during darkness and other conditions of reduced visibility.*
>
>\* \* \*
>
>175.66 Lighting and Electrical Systems.
>
>(a)    Condition of lamps and switches.  Every required lamp . . . shall be in safe operating condition as described in § 175.80 (relating to inspection procedures.)
>
>\* \* \*
>
>(e)    Other required lamps.  A vehicle specified under this subchapter shall have at least one red stop lamp on each side of the rear of vehicle, which shall be illuminated immediately upon application of the service brake.
>
>\* \* \*
>
>175.80. Inspection procedure.
>
>\* \* \*
>
>(9) Check the lamps and lenses and reject if one or more of the following apply:
>
>(i) An exterior bulb or sealed beam, if originally equipped or installed, fails to light properly, except ornamental lights.

67 Pa.Code, §§ 153.1, 175.66, 175.80.

**Conclusions of Law.**

1.    Chapter 43 of the Motor Vehicle Code regulates lighting equipment and is related to vehicle safety, and the Motor Vehicle Code makes the use of items which do not comply with the requirements of the Motor Vehicle Code or the standards and regulations promulgated by the Department of Transportation unlawful.  75 Pa.C.S. § 4101.  Pennsylvania Department of

Transportation regulations requires original and replacement lights to be operational for the safe operation of motor vehicles during darkness and other conditions of reduced visibility.

2. Considering all of the above related statutes and regulations as a whole, the Court holds that operating a vehicle with an inoperable factory installed rear window center brake light violates section 4303(b) of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S. § 4303(b) ("Every vehicle operated on a highway shall be equipped with a rear lighting system including, but not limited to, *rear lamps*, rear reflectors, *stop lamps* and license plate light, *in conformance with regulations of the department*.")

3. Officers Honick and Roetter produced specific, articulable facts that supported a reasonable suspicion of a traffic infraction, namely, violation of section 4303(b) and department regulations requiring all factory installed brake lights to be operational.

4. Officers Honick and Roetter had reasonable suspicion that the silver Mitsubishi was in violation of the Motor Vehicle Code and department regulations, and so were authorized by statute to "stop [the] vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title." 75 Pa.C.S. § 6308(b).

5. The traffic stop on December 27, 2005, was therefore lawful.

6. Because the vehicle was legally stopped, and because defendant does not challenge the subsequent conduct of the police officers or the seizure of his firearm in any other way, and because seizure of said firearm was warranted and necessary for the safety and protection of the police officers, defendant's firearm was lawfully seized.

For the foregoing reasons, defendant's motion to suppress will be denied by separate order of court.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: all counsel of record